UNITED STATES of America, Plaintiff–Appellee,

v.

Michael PRINCE, Edward A. Taylor, Defendants–Appellants.

No. 88–3939.

United States Court of Appeals, Eleventh Circuit.

Sept. 15, 1989.

---

Lynn Alan Thompson, Tallahassee, Fla., Joel Levine, Los Angeles, Cal., for Michael Prince.

Stephen N. Bernstein, Law Offices of Stephen N. Bernstein, P.A., Gainesville, Fla., for Edward A. Taylor.

K.M. Moore, U.S. Atty., Paul Alan Sprowls, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before FAY and HATCHETT, Circuit Judges, and HOFFMAN *, District Judge.

WALTER E. HOFFMAN, Senior District Judge:

On May 5, 1988 Michael Prince and Edward A. Taylor were charged with conspiracy to possess with intent to distribute in excess of 100 kilograms (kg) of marijuana in violation of 21 U.S.C. §§ 841, 846 (1982). Taylor was also charged with possession with intent to distribute more than 100kg of marijuana in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (1982). The trial was held in the United States District Court for the Northern District of Florida. On September 28, 1988, the jury returned a verdict of guilty on the conspiracy charge against both Prince and Taylor. The jury further found Taylor guilty of the possession charge. Prince and Taylor appeal the final judgment of conviction.

We now affirm both convictions.

## I. FACTS

The facts of this case essentially involve a reverse sting operation where Drug Enforcement Agency (DEA) agents posed as sellers in a large scale marijuana transaction. The relevant time frame of the conspiracy runs from approximately September, 1986 to November, 1986. The primary buyers were Jose Paz and Ted Borenstein. The Appellants alleged role in the scheme was as secondary buyers from Paz and Borenstein, who were acting as brokers of the marijuana. We will review the facts and issues on appeal regarding each defendant individually.

## A. Appellant, Michael Prince.

Prince's involvement in the conspiracy began when he was introduced to Paz in late September, 1986. Prince was a resident of Los Angeles, but was in Miami when he met Paz. At this meeting, Paz stated that he was a marijuana dealer and inquired of Prince whether he would be interested in assisting Paz in a future marijuana transaction. Prince stated that he was familiar with marijuana and may be willing to help Paz distribute marijuana if he was able and the quality of the marijuana was acceptable. Paz described Prince as a "merchandise dealer."

Also in September, 1986, Prince had arranged to rent a motor home through a friend, David Morgan, in California. Morgan agreed to rent the motor home in his name and allow Prince to use it allegedly for a golfing trip. Two other friends of Prince apparently drove the motor home to Atlanta, Georgia. These friends wished to depart the Atlanta area and leave the motor home there. Prince contacted Paz by telephone three or four times, seeking assistance in storing the motor home. Prince and Paz did not discuss marijuana over the phone. Paz testified that as a general rule he never discussed marijuana over the phone for fear of the phone line being tapped.

Paz agreed to help Prince store the motor home. He instructed Ronald Maurice, a friend in Atlanta, to get the motor home from Prince's friends and give them $600 so they could obtain plane tickets to leave Atlanta. Maurice stored the motor home at his home in Atlanta for approximately six weeks. About three weeks after Maurice took possession of the motor home, he met Paz and Prince for dinner in West Palm Beach, Florida. This apparently occurred sometime in late October or early November. Maurice testified that Prince said he would reimburse Maurice for the $600 he gave to Prince's friends. Maurice added that Prince said he was waiting to

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

look at some marijuana and would be getting some money soon.

Sometime in mid-November, 1986, the undercover DEA agents posing as marijuana dealers contacted Paz and told him they had marijuana for sale in Perry, Florida. Paz and Borenstein went to Perry and inspected the marijuana. They determined that it was of high quality and wished to purchase 5,000 pounds.

After determining that the marijuana was of acceptable quality, Paz contacted Prince and asked his permission to take the motor home to Perry, Florida. Paz did not say what use he intended for the motor home; however, he stated that Prince probably knew the motor home would be used to transport marijuana. Prince consented and then asked if he could join Paz in Perry, to which Paz consented. Prince, consequently, went to Perry and met with Paz on or about November 21, 1986. At this meeting, Paz stated that he had high quality marijuana available. Prince asked Paz if the marijuana contained seeds. Paz responded that the marijuana did contain seeds. Prince then stated that he neither wanted the marijuana nor wished to examine it. Prince went on to explain that he wanted high quality, seedless marijuana and offered to show Paz a sample in his hotel room. Having terminated their discussion of marijuana, Prince asked Paz if he could retrieve some items from the motor home. Prince retrieved a .38 caliber revolver and a 12 gauge shotgun. After this point, Prince's involvement in the marijuana transaction terminated. Prince was later arrested on November 22, 1986 at a restaurant in Perry.

B. Appellant, Edward A. Taylor.

Taylor's involvement in the drug transaction became evident just several days before its culmination on November 22, 1986. When Paz and Borenstein determined that the marijuana was of acceptable quality, they began the process of contacting potential buyers and making arrangements to broker the marijuana. Paz, Borenstein, and undercover agent Michael Luttrell decided to drive to Tallahassee airport to rent

a van. Paz proceeded to rent the van while agent Luttrell and Borenstein waited in an area where passengers were deplaning. Apparently by coincidence, Taylor was deplaning and saw Borenstein, with whom he was acquainted. Agent Luttrell testified that Taylor said he was glad he ran into Borenstein because he did not think he could find his way to Perry.

Paz and Borenstein rode back to Perry in the van and agent Luttrell and Taylor rode in agent Luttrell's car. They stopped along the way to have some dinner. At dinner, agent Luttrell heard Taylor and Borenstein discuss previous marijuana deals. Continuing their drive to Perry, Taylor stated to agent Luttrell that Borenstein called him and said he had some marijuana for him to look at. Taylor also said that he had two drivers, Chris and Steve, en route to Perry. In particular, he said that Steve was driving a red Honda which could carry 300 or 400 pounds of marijuana. He added that Steve was the same person who was involved in an earlier marijuana deal in Texas that fell through.

This Texas marijuana deal occurred in October, 1986 and involved the same undercover DEA agents posing as sellers of marijuana. The undercover DEA agents attempted to arrange a sale of marijuana to Paz and Borenstein. Another person, driving a red Honda automobile and carrying $90,000, was also involved apparently at the invitation of Borenstein. This deal was not consummated, however, because Paz and company did not like the quality of the marijuana. This failed deal set up the subsequent deal at issue in the present case.

Upon their arrival in Perry, Taylor, Borenstein, and agent Luttrell went to Borenstein's room where Taylor examined a sample of the marijuana for sale. Taylor sniffed the marijuana and manipulated it with his fingers before indicating that he was satisfied with its quality. Agent Luttrell then took Taylor to a motel a short distance away where Taylor rented a room under a false name. After these events, Taylor was not seen again in Perry.

Approximately two days later, Stephen Burress arrived in Perry driving a red Hon-

da. Burress was there to pick up marijuana and undercover agents loaded the Honda with 275 pounds of marijuana. DEA agents arrested Burress on November 22, 1986 as he drove his Honda out of Perry.

On November 22, 1986, Chris Norman also arrived in Perry to purchase marijuana. He arrived with $77,000, which he gave to Borenstein. Special agent Thomas Turk of the Florida Department of Law Enforcement testified that Norman obtained the $77,000 from Taylor.

## II. DISCUSSION

### A. Appellant, Michael Prince.

Prince raises two issues on appeal. First, Prince claims that the government did not present sufficient evidence to support Prince's conspiracy conviction. Specifically, Prince maintains that the government did not establish Prince and Paz had an "agreement" to engage in a marijuana transaction. The second issue Prince raises is whether there was a significant variance between the conspiracy charged in the indictment and the conspiracy proven at trial.

1. *Whether there was sufficient evidence to support the conspiracy conviction?*

■ Prince contends that the evidence presented at trial was insufficient to support his conspiracy conviction. The standard of review on this issue is whether the evidence, when viewed in a light most favorable to the government, proved Prince's guilt beyond a reasonable doubt. *United States v. Carcaise,* 763 F.2d 1328, 1330–31 (11th Cir.1985); *United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.), *cert. denied sub nom. Gonzales v. United States,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). If a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt, then we must affirm the conviction. *United States v. Sullivan,* 763 F.2d 1215, 1218 (11th Cir.

1. The Eleventh Circuit, sitting en banc, adopted as binding precedent all decisions by the former Fifth Circuit rendered prior to October 1, 1981.

1985); *United States v. Alvarez,* 696 F.2d 1307, 1311 (11th Cir.), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983).

Prince basically makes two arguments: first, that no "agreement" linking Prince to the conspiracy was established; and, second, that even if an agreement could be inferred, it was insufficient to support the conspiracy conviction because it was subject to a condition precedent that the marijuana not contain seeds.

a. Whether The Jury Could infer an "agreement" between Prince and Paz for the purchase and sale of marijuana?

■ To prove a conspiracy, the government must show, beyond a reasonable doubt, that a conspiracy existed, that Prince knew of it, and that Prince, with knowledge, voluntarily joined the conspiracy. *United States v. Corley,* 824 F.2d 931, 936 (11th Cir.1987); *United States v. Jenkins,* 779 F.2d 606, 609 (11th Cir.1986); *Sullivan,* 763 F.2d at 1218. The government must prove that there was an agreement to cooperate for mutual gain and that Prince had a deliberate, knowing, and specific intent to join the conspiracy. *Jenkins,* 779 F.2d at 609; *U.S. v. Amato,* 495 F.2d 545, 549–50 (5th Cir.), *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 286 (1974).[1] However, the agreement and Prince's participation in the conspiracy need not be explicit; it may be inferred from circumstantial evidence. *Sullivan,* 763 F.2d at 1218 (citing *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.), *cert. denied,* 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982)).

■ Prince does not dispute that a conspiracy existed, but he maintains that he was not a participant in it. Prince contends that the only evidence supporting his conspiracy conviction was his presence in Perry at the time of the marijuana transaction. Prince correctly states that mere presence at the scene of the crime is insuf-

*Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

ficient to support a conspiracy conviction. *Jenkins*, 779 F.2d at 612; *United States v. Torres*, 720 F.2d 1506, 1510 (11th Cir.1983). Presence at the scene of the crime, however, may be "material and probative in the totality of the circumstances." *Jenkins*, 779 F.2d at 612; *see also Corley*, 824 F.2d at 937. The trial record demonstrates that there was substantial evidence, in addition to Prince's presence in Perry, supporting the conspiracy conviction. In particular, the following evidence was adduced at trial:

1) Prince obtained a motor home rented in someone else's name and had it driven to the east coast.

2) When Prince and Paz met they tacitly agreed to assist each other in some future marijuana transaction. At this meeting Prince described himself as a "merchandise dealer" of marijuana.

3) During the relevant period of the conspiracy, Prince maintained telephone contact with Paz, although they discussed arrangements regarding the motor home rather than marijuana.

4) Maurice, a co-conspirator, testified that while having dinner with Prince and Paz in West Palm Beach, Florida, apparently in late October or early November, 1986, Prince stated that he would be getting some money soon and was waiting to look at some marijuana.

5) When Paz asked to borrow the motor home in mid-November, 1986, Prince consented with no questions asked and also requested if he could join Paz in Perry, Florida.

6) When Prince met Paz in Perry, he discussed the quality of the marijuana for sale and refused to purchase it only after learning that the marijuana contained seeds. He offered to show Paz a sample of the type of marijuana he wished to purchase.

7) Prince was from California, and Paz had told agent Luttrell that he had a buyer from California who was waiting on a couple of million dollars to arrive.

8) Prince was carrying a .39 caliber revolver and a 12 gauge shotgun in the motor home. Agent Luttrell testified that drug dealers often carry guns when transacting drug deals.

Thus, when viewed in the totality of the circumstances, there was substantial evidence that Prince was more than "merely present" in Perry at the time of the drug transaction. We hold, therefore, that sufficient evidence existed for the jury to infer, beyond a reasonable doubt, that Prince and Paz had an "agreement," and that Prince was a participant in the conspiracy.

b. Whether the agreement was insufficient to support a conspiracy conviction because it was subject to a condition precedent that the marijuana not have seeds?

The fact that Prince rejected the marijuana because it had seeds does not necessarily defeat the inference that an agreement was reached. The Fifth Circuit, in a case that is binding precedent upon the Eleventh Circuit,[2] held in a marijuana importation case that an agreement which was subject to a condition does not make it any less an agreement. *United States v. Grassi*, 616 F.2d 1295, 1302 (5th Cir.1980) (defendants stated they would import marijuana only if they became satisfied they were not dealing with police), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980); *cf. United States v. McDowell*, 705 F.2d 426, 428 (11th Cir.1983) (affirming a conviction of attempt, the court noted that criminal intent may exist even with refusal to purchase drugs because of poor quality). Prince contends that a conditional agreement to buy may support a conspiracy conviction only if the potential buyer believes the condition likely to be fulfilled. *United States v. Anello*, 765 F.2d 253 (1st Cir.), *cert. denied sub nom. Wendolkowski v. United States*, 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985); *cf. United States v. Melchor–Lopez*, 627 F.2d 886, 891 (9th Cir. 1980) (finding no agreement because defendant insisted on conditions unacceptable to

---

2. *See supra* note 1.

his would-be co-conspirators). Prince argues that there was no agreement because his purchase of the marijuana was conditioned upon it being seedless and that this condition was not "likely to be fulfilled."

We disagree. There is no evidence that prior to Prince's rejection of the marijuana, he imposed on Paz a condition that he would be interested in only seedless marijuana. The fact that Prince went to Perry and inquired of the type of marijuana Paz had for sale indicates that Prince believed Paz would have the type of marijuana he wished to buy. Thus, a jury could reasonably infer from this evidence, beyond a reasonable doubt, that Prince had an agreement to purchase marijuana.[3] Prince's dissatisfaction with the quality does not make the agreement any less of an agreement for conspiracy purposes.

2. *Whether there was a material variance between the allegations in the indictment and the facts established at trial?*

■ The standard of review for this issue is twofold. First, we must determine whether a material variance did indeed occur; and, second, whether Prince suffered substantial prejudice as a result of the variance. *United States v. Champion*, 813 F.2d 1154, 1166 (11th Cir.1987); *United States v. Caporale*, 806 F.2d 1487, 1499 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987).

■ The indictment charged Prince as a participant in a single conspiracy to possess with intent to distribute in excess of 100kg of marijuana. Prince contends that the indictment contains a fatal variance from what was proven at trial because there were multiple conspiracies among the various participants and that he was involved in a conspiracy separate and distinct from the one charged in the indictment. Prince claims that he and Paz were discussing the purchase and sale of "seedless" marijuana,

not merely "marijuana" as charged in the indictment. Thus, Prince concludes that any conspiracy he was involved in was between he and Paz, while Paz and Borenstein, for instance, were involved in a separate conspiracy not dependent on Prince.

■ If an indictment alleges a single conspiracy and the evidence at trial establishes the existence of multiple, independent conspiracies, the defendant's conviction should be reversed only if his substantial rights were affected. *Jenkins*, 779 F.2d at 616 (quoting *United States v. Cole*, 755 F.2d 748, 764 (11th Cir.1985)). The question of whether the evidence supports finding a single conspiracy is a question of fact for the jury. *Champion*, 813 F.2d at 1165. Furthermore, this Court has stated that "even if the evidence arguably establishes multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *Champion*, 813 F.2d at 1166 (quoting *Caporale*, 806 F.2d at 1499–1500). In determining whether the jury could have found a single conspiracy, we must consider the following three factors: (1) whether there was a common goal; (2) the nature of the criminal scheme; and (3) the overlap of the participants in the various dealings of the conspiracy. *Id.; Jenkins*, 779 F.2d at 616 (quoting *Cole*, 755 F.2d at 764).

Viewing the evidence in a light most favorable to the government, we find that a reasonable jury could have concluded that a single conspiracy existed between Prince and the other participants. The scheme and common goal of the conspiracy was for Paz and Borenstein to locate a large quantity of marijuana and broker it to Prince and others for distribution. As stated above, that Prince rejected the marijuana because it had seeds did not operate

---

**3.** It should be noted that Paz testified Prince was in Perry only to remove weapons from the motor home, and that Paz did not have an agreement with Prince to sell marijuana. Record, vol. 3 at 44–45. Weighing the credibility of witnesses, however, is within the province of the jury, and the jury is free to believe or disbelieve any part or all of the testimony of a witness. *See Wilcox v. Ford*, 813 F.2d 1140, 1146 (11th Cir.1987); *see also United States v. Merida*, 765 F.2d 1205, 1220 (5th Cir.1985).

to lessen any agreement he had with Paz. Prince's contacts with other participants in the conspiracy included Paz and Maurice. Prince may not have known some of the other co-conspirators, but "a participant in a conspiracy need not be privy to all of the details of a conspiracy, or aware of all other participants, or even participate in each stage of the conspiracy, so long as the conspirator intentionally joined the common purpose to violate the law." *Jenkins,* 779 F.2d at 616–17 (citing *United States v. Brito,* 721 F.2d 743, 747 (11th Cir.1983)).

The jury was able to consider the defense theory of multiple conspiracies and was given a multiple conspiracy instruction. The jury rejected this theory and found beyond a reasonable doubt that there was a single conspiracy. There is no merit, therefore, to Prince's claim that there was a material variance between the single conspiracy charged in the indictment and what was proven at trial. We further note that even if there was a material variance, Prince has failed establish that there was any prejudice to his substantial rights.[4]

### B. Appellant, Edward A. Taylor.

Taylor also raises two issues on appeal. The first issue involves whether the government presented independent proof of Taylor's involvement in the conspiracy other than his own statements. The second issue concerns whether the district court erred in denying Taylor's motion for a mistrial after the government elicited a hearsay statement from a witness.

*1. Whether the government presented evidence independent of Taylor's own statements linking him to the conspiracy?*

■ Taylor argues that he cannot be convicted solely on the basis of his own uncorroborated statements. As authority, Taylor relies on *Fallada v. Dugger,* 819 F.2d 1564 (11th Cir.1987) and *United States v. Ianniello,* 808 F.2d 184 (2d Cir. 1986), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989). This Court in *Fallada* held that a conviction cannot be based solely upon an uncorroborated confession or admission. *Id.* at 1570. Because Taylor's statements were made during the conspiracy rather than as a confession, the rule in *Fallada* is not necessarily applicable in this case.[5] We need not address that issue, however, because the record demonstrates Taylor's statements were substantially corroborated.

Specifically, Taylor's statements were corroborated with the following evidence: 1) Taylor stated to agent Luttrell that he had two drivers, Chris and Steve, coming to Perry to transport the marijuana. This statement was corroborated by the fact that Chris Norman and Steve Burress arrived in Perry to transport marijuana. Steve Burress was driving a red Honda as

---

**4.** This Court in *Caporale,* 806 F.2d at 1500, stated that a material variance may cause prejudice to substantial rights in two instances:

1) where the proof at trial differed so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense; and 2) where there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury would transfer evidence from one conspiracy to a defendant involved in another conspiracy.

Prince has made no specific showing, and it does not appear, that he was unfairly surprised or that the jury improperly transferred evidence to find Prince guilty.

**5.** Taylor's statements do not seem the type that would require corroboration. This Court's holding in *Fallada* applies to confessions. The purpose of requiring corroboration is to prevent the use of confessions that may have been coerced or otherwise unreliable. Such a danger is not present in this case because Taylor's statements were made during the conspiracy.

The Second Circuit in *Ianniello* apparently has expanded this corroboration rule to all admissions by a defendant, whether before or after the crime. *Id.* at 194–95. The court set forth a rule that a defendant's statements may be used as the sole basis for a conviction only when there is some "independent indicia of reliability." *Id.* at 195. The court noted that reliability may be indicated by the circumstances of the statements. *Id.* Thus, even under the Second Circuit's rule, corroboration is not a necessity if the circumstances indicate reliability. Taylor's statements made during the conspiracy are likely under circumstances which create an independent indicia of reliability.

Taylor said he would be, and Steve Burress was the same individual who was involved in the Texas deal as Taylor indicated to agent Luttrell. 2) Chris Norman arrived with $77,000 to be paid to Borenstein for the purchase of marijuana. Testimony was elicited at trial which indicated that Taylor was the source of this money. 3) Upon arriving in Perry, Taylor accompanied Borenstein to his motel room and examined a sample of the marijuana before indicating that he was satisfied with the quality. 4) Taylor registered under a false name to cover his presence in Perry.

We find, therefore, that Taylor was not convicted solely on the basis of his own statements, and we further find that sufficient evidence supported Taylor's conviction.

2. *Whether the district court erred in denying to grant a mistrial after it was brought to the court's attention that the government had elicited a hearsay statement from a witness?*

■ Taylor complains that during the government's cross-examination of agent Turk, the prosecutor improperly elicited prejudicial hearsay testimony. The testimony related to post-arrest statements by Chris Norman, who allegedly was one of Taylor's couriers of the marijuana. Apparently, Chris Norman entered a plea agreement with the government pursuant to which he stated that Taylor gave him the $77,000 he used to purchase the marijuana. Some time later Chris Norman became dissatisfied with his plea agreement and recanted his previous statements and also refused to testify at trial.

There is no dispute that Chris Norman's statements were made well after his arrest, and that the statements would not be admissible under the co-conspirator exception to the hearsay rule. *Fiswick v. United States*, 329 U.S. 211, 217, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946); *United States v. Poitier*, 623 F.2d 1017, 1020–21 (5th Cir.1980). Nevertheless, the government, during its cross-examination of agent Turk, elicited testimony based on Chris Norman's post-arrest statements that Taylor was the source of the $77,000. The relevant testimony is as follows:

Q: [By counsel for the government] . . . In reading your reports or interviews you don't know where that money [the $77,000] came from. In preparing for this case, in the same questions Mr. Taylor's attorney posed to you, in your overall preparation for this case, do you know where that money came from?

A: [By agent Turk] From what I—what we developed before, or Mr. Norman.

Q: Yes, Sir, in preparing this case.

A: Yes, Sir. It came from Mr. Taylor. Mr. Norman was acting in the behalf of Mr. Taylor.

Record, vol. 4 at 115–16.

There is no dispute that agent Turk testified based on knowledge he obtained from Chris Norman's post-arrest statements. Although Taylor did not immediately object to this testimony,[6] he raised an objection on redirect examination when it became evident that agent Turk's testimony was based on inadmissible hearsay. On redirect examination Taylor began questioning agent Turk on Chris Norman's plea agreement. The government objected and requested the court to hold a side bar conference. Taylor explained to the judge that agent Turk's testimony was based on Chris Norman's post-arrest statements. Taylor then moved to strike the objectionable testimony and also moved for a mistrial. The court denied these motions, basically holding that Taylor had opened the door to this line of questioning. We find no reversible error with respect to the court's ruling.

---

**6.** The government argues that Taylor's objection was untimely, and, therefore, not preserved for appeal. In such an instance, we could reverse the district court only upon a showing that plain error resulted from admission of the testimony. *United States v. Hernandez–Cuartas*, 717 F.2d 552, 555 (11th Cir.1983); *United States v. Chilcote*, 724 F.2d 1498, 1503 (11th Cir.), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984). The district court, however, did not deny Taylor's objection on the basis of untimeliness. Instead the court found that Taylor had opened the door to this line of questioning.

A trial court is afforded broad discretion on the admissibility of evidence and will be overruled only upon a showing of abuse of that discretion. *United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir.1987); *United States v. Rosenthal*, 793 F.2d 1214, 1245 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). A trial court's ruling on a motion for a mistrial also will not be disturbed absent a clear showing of abuse of discretion. *United States v. Cousins*, 842 F.2d 1245, 1247 (11th Cir.1988); *United States v. Baldwin*, 644 F.2d 381, 385 (5th Cir. Unit A May 1981).

The record indicates that Taylor initiated questioning requiring agent Turk to answer based on knowledge he gained in preparing for the case. The relevant testimony is as follows:[7]

Q: [By counsel for Taylor] Agent Turk, are you aware that that videotape was made at the time that Mr. Borenstein counted the money that Mr. Norman brought in his suitcase?

A: [By agent Turk] I'm not aware of what time that one was made; no sir. I wasn't present when the tape was made.

Q: Are you aware *in your preparation of this case* that Mr. Norman did bring the $77,000 in a suitcase?

7. We note that the government's brief cites record references from Taylor's earlier *cross-examination* of agent Turk during the government's case. The objectionable testimony Taylor complains of came when Taylor, during presentation of his own case, called agent Turk as a witness. Although there were three intervening witnesses between the government's cited record references and the objectionable testimony at issue, those references are helpful as background for Taylor's subsequent questioning. The following are record excerpts of Taylor's earlier cross-examination of agent Turk:

Q: [By counsel for Taylor] In talking—in preparing this case for trial, sir, you have reviewed the other agents' reports and helped the Prosecutor prepare this case for presentation, haven't you?

A: [By agent Turk] Yes, sir.

Q: In your role in that capacity, isn't it true that there is no agent, either by report or word of mouth to you, that saw Mr. Taylor in Perry, Florida on the 21st day of November, 1986?

A: Yes, sir.

Record, vol. 4 at 111 (emphasis added).

The government's questions on cross-examination, *see supra*, simply elaborated on Taylor's questioning when it asked agent Turk if, in his preparation of the case, he knew who was the source of the $77,000. The district court, exercising its discretion, determined that Taylor had opened the door to this line of questioning. The record excerpts of Taylor's questioning, *see supra* text & note 7, support the district court's ruling.

Although the court denied Taylor's motions to strike and for a mistrial, the court permitted Taylor to show that Chris Norman refused to testify at trial and had recanted his statement that Taylor was the source of the $77,000. Thus, any detrimental impact caused by admission of the testimony was substantially lessened. Under these circumstances, we cannot say that the district court abused its discretion in admitting the evidence and denying Taylor's motion for a mistrial.

### III.

Accordingly, the jury's conviction of Michael Prince and Edward Taylor on the charge of conspiracy to possess with intent to distribute in excess of 100kg of marijuana is AFFIRMED. The jury's conviction of

\* \* \* \* \* \*

A: Yes, sir. That's correct, sir.

\* \* \* \* \* \*

Q: When you said the 22nd when you arrested Burres and Maurice and Ayala, Paz and Borenstein were back in Perry waiting on additional money?

A: Yes, sir.

Q: Wasn't that the additional money that Borenstein knew was coming from Christopher Norman, $77,000?

A: I don't recall if it was Chris Norman or who it was, sir. I know they were waiting on additional money to buy the additional pot.

Q: *Are you aware that the next person who provided money was Christopher Norman when he drove the rented yellow Cadillac up to Perry and it was counted out on videotape surveillance?*

A: I'm aware that Mr. Norman did deliver money; yes, sir.

Record, vol. 4 at 20–21.

Edward Taylor on the charge of conspiracy to possess in excess of 100kg of marijuana is also AFFIRMED.