United States Court of Appeals,

Eleventh Circuit.

No. 95-6378.

Henry F. HAYS, Petitioner-Appellant,

v.

STATE OF ALABAMA, C.E. Jones, Respondents-Appellees.

June 6, 1996.

Appeal from the United States District Court for the Southern District of Alabama. (No. 93-623-CB-S), Charles R. Butler, Jr., Chief Judge.

Before KRAVITCH, EDMONDSON and BIRCH, Circuit Judges.

EDMONDSON, Circuit Judge:

Henry Hays petitioned for a writ of habeas corpus, alleging constitutional errors in the state court proceedings surrounding his conviction for murder and sentence of death. The district court denied relief. We affirm.[1]

*FACTS AND BACKGROUND*

In 1981, the defendant Henry Hays ("Hays"), his father Bennie Hays, and Henry's friend and later accomplice James "Tiger" Knowles were following developments in the trial of a black man accused of killing a white man. The three men, all members of the Ku Klux Klan, discussed the likely public reaction to the hanging of a black man. Perhaps worried about property values, Bennie Hays told his son and Knowles to do nothing until Bennie had sold some

---

[1]Shortly before the release of this opinion the Antiterrorism and Effective Death Penalty Act of 1996 was signed into law; the Act aims to expedite the process of federal collateral review. Because we deny the petition according to pre-existing standards, we have no occasion to consider whether the Act provides a basis for the denial of relief. We are confident the Act does not help Hays.

apartments on Herndon Avenue.

Shortly thereafter, according to Knowles's testimony, the property sale closed. Hays and Knowles got a rope, which they tied into a hangman's noose, and a gun from fellow Klansmen. The two then set out to look for a black man. They randomly found Michael Donald, pulled alongside him in their car, and asked for directions. They forced him into the car at gunpoint. Knowles made Donald empty his pockets; Knowles's trial testimony indicates he wanted to be sure the victim was unarmed.

Hays found a desolate area and parked; all three men got out of the car. Facing Hays and Knowles (who was holding the gun), Donald jumped Knowles in an attempt to escape. After a struggle, Hays and Knowles forced Donald to the ground. Hays retrieved the noose, and the two of them put it around Donald's neck. Hays dragged Donald while Knowles beat him with a tree limb; and when Hays's hands began to hurt, they switched. When Donald collapsed, the two men dragged him, face first, across the ground. Autopsy reports showed Donald probably died from asphyxiation during this time. Nevertheless, Henry Hays slashed Donald's throat. Donald's body was found later that morning, hanging from a tree on Herndon Avenue.

Hays was charged after a two year investigation. The prosecution—after requesting a continuance, ostensibly because it had not received some evidence—returned a new indictment one day before trial. At trial, Hays was convicted; the jury recommended life without parole; but the trial judge overrode the recommendation and sentenced Hays to death by electrocution.

On direct appeal, the intermediate appellate court reversed, holding the trial judge lacked the power to override the jury's decision. *Hays v. State,* 518 So.2d 749, 767-68 (Ala.Crim.App.1985). The Alabama Supreme Court reversed the appellate court and reinstated the death sentence. *Ex parte Hays,* 518 So.2d 768, 777 (Ala.1986). The U.S. Supreme Court denied the petition for certiorari. *Hays v. Alabama,* 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988). Petitions for post-conviction relief were denied by the Alabama state courts, and the U.S. Supreme Court again denied certiorari. The present petition for habeas relief was denied by the district court in a comprehensive opinion.

*DISCUSSION*

I. Trial Counsel's Strategic Decisions

Hays argues his trial counsel was ineffective within the meaning of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because he (1) failed to interview Knowles early enough; (2) never spoke to several defense witnesses before putting them on the stand; (3) failed to examine physical evidence early enough; (4) failed to request funds for an investigator; (5) failed to attempt to show cause why Hays was entitled to grand jury materials; (6) failed to use the testimony of Hays's father; (7) failed to object to the introduction of uncharged criminal offenses; (8) failed to object to the trial court's failure to find mitigating circumstances; (9) failed to argue Hays's sentence was disproportionate to Knowles's; (10) failed to object to the court's failure to give a lesser included offense charge; and (11) failed to object to the trial judge's override of the jury's

sentence recommendation.

The district court accepted Petitioner's assertions that these acts constituted deficient performance. The court held, however, that because the petitioner "completely omits any discussion of the prejudice prong" of the *Strickland* formulation, and because the "evidence against the petitioner at trial was such that even a flawless performance by counsel would have had little effect on the outcome," there was no denial of effective assistance.

Petitioner's brief in this court also includes no discussion of how better performance by trial counsel would have changed the likely outcome of the trial or sentence; and we agree with the district court that absent such a showing, Petitioner's *Strickland* claims fail. *See, e.g., Strickland,* 466 U.S. at 693-94, 104 S.Ct. at 2068 (petitioner arguing ineffective assistance "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). To allege prejudice successfully, Hays must "show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993) (citations and internal quotation marks omitted).

For those factors dealing with trial counsel's preparation of witnesses and development of the facts (the claims numbered 1-6 above), Hays provides no explanation of how better preparation might have changed the course of the trial. Thus, the alleged errors cannot support reversal. *See, e.g., Devier v. Zant,* 3 F.3d 1445, 1452 (11th Cir.1993) (declining to grant relief where

petitioner "has not carried his burden of showing how the testimony of these witnesses would have changed if they had been better prepared").

For factors 7-11, Petitioner again fails to show with particularity how the decision not to make the listed objections was constitutionally unreasonable or prejudicial. For example, Hays nowhere argues that the evidence of uncharged offenses was actually inadmissible or that that evidence probably swayed the jury. *See Strickland,* 466 U.S. at 693-94, 104 S.Ct. at 2068 (requiring prejudice to be shown). Nor does he succeed in demonstrating that mitigating circumstances could have been proved under Alabama law. In view of the overwhelming evidence supporting the verdict, we conclude there has been no showing, under *Strickland,* that Hays's counsel's allegedly unreasonable errors affected the outcome of the guilt or penalty phases of the trial.

II. Refusal to Grant a Continuance

Hays also argues he was denied effective assistance of counsel by the trial court's refusal of his request for a continuance after the prosecution returned a new indictment, alleging different facts, less than one day before trial was to begin. The new indictment charged robbery-murder; the old indictment had charged kidnapping-murder. Kidnapping-murder was not punishable by death under the statute effective on the date of Donald's murder. The original indictment did give notice of the state's intent to seek the death penalty, but did not mention robbery or the use of a gun.

As the Court noted in an analogous situation, the Constitution

"nowhere specifies any period which must intervene between the required appointment of counsel and trial." *Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940). Thus, in this context, the courts must "respect ... the States' determination of local social policy." 308 U.S. at 447, 60 S.Ct. at 322. "[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to assistance of counsel." *Morris v. Slappy,* 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) (citations and internal quotation marks omitted).

This instance is not one where circumstances conspired to create a "presumption" that ineffective assistance changed the likely outcome of the trial. In *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Court carved a narrow exception to the general rule that those persons claiming ineffective assistance must show prejudice. 466 U.S. at 658-59, 104 S.Ct. at 2046-47; *see also Stano v. Dugger,* 921 F.2d 1125, 1152 (11th Cir.1991) (en banc). Prejudice is presumed when counsel was either totally absent or prevented from assisting the accused during a critical stage of the proceedings, *Cronic,* 466 U.S. at 662, 104 U.S. at 2049, or if counsel entirely failed to subject the prosecution's case to meaningful adversarial testing. *Id.* But, this case is not one of those situations. Therefore, Hays must show prejudice. Because he cannot, his ineffective assistance claim fails.

From the start, the strategy followed by Hays's trial counsel was to contend that Knowles acted alone and later implicated Hays to increase his chances of a reduced sentence. The decision to present an alibi defense was not undermined by the prosecution's change in its theory of the underlying felony. Hays was simply not present during the murder, according to the defense; and therefore the presence or absence of a gun should not have significantly impacted the defense's preparation of witnesses and arguments for trial.

Because the denial of the continuance had no substantial impact on the orderly preparation for trial, the circumstances of the denial of the continuance are similar to (but, far less egregious than) the facts of *Avery, supra.* There Justice Black, writing for a unanimous Court, held that no Sixth Amendment violation occurred when the petitioner's lawyers were appointed on Monday for a trial scheduled to begin Wednesday and a continuance was denied. Nothing concrete indicated that extra time could have changed the trial's outcome.

For one thing, Avery's trial took place in "a County largely rural," where access to witnesses is easier than elsewhere. *Avery,* 308 U.S. at 452, 60 S.Ct. at 324-25. Here, Hays's attorney had access to the only two witnesses to the murder. And, the record at Avery's trial showed an "absence of any indication ... that [counsel] could have done more had additional time been granted." *Id.* Hays's habeas counsel claims that interviews and tests pertaining to the gun were necessary; but in the years since the trial, no evidence has emerged to show that such a course would

have changed the evidentiary balance at trial. In addition, we also conclude, as discussed above, that Hays has failed to make out a compelling case for ineffective assistance based on trial counsel's strategic decisions. Thus, the facts in *Avery,* where counsel was found not to be ineffective, closely parallel those here. And, the substantial evidence supporting the fact of the robbery suggests that even with more time, the verdict would have been the same. Thus, Hays was not deprived of "a trial whose result is reliable." *Lockhart,* 503 U.S. at 369, 113 S.Ct. at 842.

## III. Suppression of Witness Testimony

Hays argues the state violated its obligation to turn over exculpatory evidence in its possession by withholding some 20 statements made by Knowles, the state's main witness, which Hays alleges could have been used to impeach. The District Court held that the state suppressed the statements, and the defense had no other source.[2] Thus, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires a new trial if the petitioner has shown, in addition to the above two factors, that the information was favorable to the defendant and that, "had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been

---

[2]As a preliminary matter, the district judge held that knowledge of statements in the possession of federal agents could be imputed to the state. This conclusion was based on the level of cooperation between the state prosecutors and the F.B.I. *See United States v. Antone,* 603 F.2d 566, 570 (5th Cir.1979) (looking to the "extent of cooperation between the two governments" to determine whether possession should be imputed). Citing no cases, the state argues here that the district court's holding was error. We decline to conclude that the district court erred in this case on the imputation issue.

different." *See United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.1989) (setting out four-factor test for determining whether evidence is *Brady* material).

The issue is thus whether it is reasonably probable that the suppression of the statements caused a different outcome at trial. The Supreme Court recently decided *Kyles v. Whitley,* --- U.S. ----, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), which discussed the "reasonable probability" standard of *Brady.* Without announcing new rules, the Court cited four guideposts for determining materiality. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles,* --- U.S. at ----, 115 S.Ct. at 1566 (citing *United States v. Bagley,* 473 U.S. 667, 680-84, 105 S.Ct. 3375, 3383-84 (1985). Thus, undisclosed evidence can require a new trial even if it is more likely than not that a jury seeing the new evidence would still convict. A defendant must show simply that "the Government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles,* --- U.S. at ----, 115 S.Ct. at 1566 (citations and internal quotation marks omitted).

Second (and logically implicit in the first rule), a defendant need not show there was insufficient evidence to convict in view of the suppressed evidence. *Id.* Third, there is no harmless error review of *Bagley* errors. *Id.* Fourth, materiality is to be determined collectively, not "item-by-item." *Id.* at ----, 115 S.Ct. at 1567. The Supreme Court's reiteration, in *Kyles,* of the prejudice standard of *Brady* is consistent with the threshold set by

the district court.

Whether a reasonable probability existed that the suppressed evidence would have changed the outcome is a mixed question of law and fact, and this court's review is *de novo.* *United States v. Rivalta,* 925 F.2d 596, 597-98 (2d Cir.1991).

The "statements" at issue are actually memos about statements made by Knowles, recording the recollections of federal and state agents. Hays asserts two theories to explain why suppression of the statements requires reversal: first, the suppressed statements, taken together, show Knowles to be so totally unworthy of belief that a jury would have rejected his testimony entirely. Second, specific inconsistencies in the statements would have cast enough doubt on critical junctures in the prosecution's version of the murder to undermine confidence in the verdict.

Hays argues first that the suppressed statements, in total, showed Knowles to be so inconsistent in his retelling of Donald's murder that no rational juror could have credited Knowles's testimony. The district court disagreed, writing that the suppressed statements show not a pathological dishonesty, but rather a consistent progression from obfuscation to truth-telling. That is, Knowles's testimony, taken in the light of all of his statements, shows a pattern of first withholding and then divulging more and more of his ultimate version of the crime.[3] Also, the withheld statements are almost uniformly consistent with Knowles's

---

[3]Knowles contends he withheld some aspects of the crime at first because, though he wanted to confess, he was still uncomfortable revealing to authorities just how "gruesome" the details of the crime were.

trial (that is, later) testimony. That the statements would have helped, rather than hindered, Knowles's overall credibility at trial is thus very possible. In any event, we agree with the district judge's observation that trial counsel succeeded in compelling Knowles to admit to so many lies that the marginal impact of the suppressed statements would have been insignificant. Thus, we reject Hays's suggestion that the withheld statements show such a pattern of inconsistency as to create a "reasonable probability" that a jury hearing them would have rejected Knowles's testimony *in toto.*

In his brief to this court, Petitioner also enumerated several specific inconsistencies between Knowles's earlier and later accounts of the crime, each of which ostensibly could have been highlighted only by reference to the suppressed statements. These are: (1) Knowles earlier said Donald voluntarily agreed to ride in the car; he later said he used the gun to force Donald into the car. (2) Knowles earlier said he and Hays picked Donald up without intending to kill him; later he said they did so intend. (3) Knowles earlier omitted any mention of the use of the gun; but he later admitted the gun was used. (4) Knowles earlier said the cross-burning that occurred the night of the murder was unrelated to the murder, and later contradicted this statement.

Taken together, these assertions do not undermine confidence in the verdict. The main reason for this is that most of the asserted uses of the suppressed statements would have been redundant, because Hays's counsel in fact elicited testimony from Knowles on the witness stand acknowledging that he had been

inconsistent on many of the listed points. [4] And on others (particularly the relatedness of the murder and cross-burning), no obvious reason suggests that the jury would have regarded the inconsistency as particularly significant. Therefore, we conclude that Petitioner's argument on the materiality of the alleged *Brady*

---

[4]For example, when asked successively about a number of inconsistencies, Knowles admitted lying about the fact that Donald got into the car voluntarily:

> Q. And you told [the investigating agent] in that same statement that you called Michael Donald over to the car and he got in voluntarily to show you the way to a club?
>
> A. Yes, sir.
>
> Q. That's another lie, huh?
>
> A. Yes, sir.
>
> Tr. Trans. at R-273.

Knowles also admitted (more than once) that he had given numerous statements, in his early rendition of the murder, in which he omitted any mention of the use of a gun. For example:

> Q. Did you give [the previously read statement] to Mr. Tom Calhoun of the Mobile Police Department?
>
> A. Yes, I did.
>
> Q. Did you make any mention in that statement about any gun?
>
> A. No, sir, I did not.
>
> Tr. Trans. at R-209.

Finally, Hays's counsel did read a statement indicating an agent's recollection that Knowles said "they [he and Hays] did not intend to hurt" Donald when they picked him up. Tr. Trans. at R-208. This testimony was also contradicted by other statements Knowles made on the stand.

Thus, at least three of what Petitioner regards as the most effective uses of the suppressed statements would in fact have added little or nothing to the defense case.

statements fails.

IV. The State's Use of Allegedly Perjured Testimony

Knowles testified at his plea hearing in federal court (pursuant to which he was sentenced to life in prison) that he and Hays did not intend to kill Donald when they picked him up or when they first got the rope with which Donald was hung. But at Hays's trial, Knowles testified they set out that night with the intent to kill a black man.

*Napue v. Illinois,* 360 U.S. 264, 268-70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), dictates that knowing use by the prosecution of perjurious testimony violates a defendant's right to due process. But, as the district court points out, there has been no showing that Knowles's later, rather than earlier, testimony was false; and the circumstances of Knowles's testimony (which show a progression toward greater revelation of the truth) indicate it is likely the former was untrue. Because Hays can cite no case holding that plea testimony must be consistent with later testimony, use of Knowles's testimony did not violate due process.

Hays also contends the prosecution unconstitutionally refused to disclose that Knowles's testimony was obtained in exchange for a plea bargain. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), requires such disclosure. Hays has inferred that because Alabama never prosecuted Knowles for the murder, there must have been an agreement; the state responds there was none. Hays has presented no evidence that there was an agreement between state agents and Knowles; and the jury was fully informed of Knowles's plea agreement with the federal government.

There was no *Giglio* violation.

V. The Sufficiency of the Evidence of Robbery-Murder

Hays argues the state did not present sufficient evidence at his trial to prove intent to rob. Intent to rob was an element of the underlying offense, and therefore proof beyond a reasonable doubt was required under *In re Winship,* 397 U.S. 358, 361, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970).

Donald was carrying money given to him by a relative when he was last seen, and his wallet was not with the body. The money was never found. Knowles testified he and Hays had Donald empty his pockets to ensure Donald had no weapons. The district court found this satisfied the intent requirement because Hays and Knowles intended to deprive Donald of weapons, but instead deprived him of cash: "The fact that Donald did not have the item Knowles and the petitioner were seeking does not render their intent illusory, any more than the intent present in a mugger's "Your money or your life' demand is negated when the victim hands over his watch in place of cash." Hays contests the analogy, arguing there was no true intent to take weapons, only to ensure their absence.

The intent to rob under Alabama law is the intent to take and carry away the personal property of another by force or by putting the other in fear of the use of force. *Davis v. State,* 401 So.2d 187, 189 (Ala.Crim.App.1981). Applying this test, the intent to deprive someone of weapons provides the requisite intent, regardless of whether self-protection is the overriding motive. Taking a wallet with this goal in mind is robbery; and, therefore, Knowles's testimony on his and his accessory's state of mind is

sufficient evidence to convict for robbery-murder.

Hays also asserts there was no intent to kill. He cites testimony by Knowles that the two set out to harass, not to kill, a black person. But as noted in the state post-conviction proceedings, under Alabama law "[p]remeditation and deliberation may be formed while the killer is pressing the trigger that fired the fatal shot." *See Hays v. State,* 599 So.2d 1230, 1238 (Ala.Cr.App.1992) (citations and internal quotation marks omitted). Thus, in view of the extensive testimony about Donald's ordeal (the beating with the tree limb, the dragging by the noose, and the slitting of his throat), that Hays might not initially have set out to kill Donald is of no consequence.

VI. The Trial Judge's Override of the Jury Recommendation

After the jury recommended life without parole, the trial judge overrode the recommendation and sentenced Hays to death. At the time, Alabama law was unsettled on what weight the trial judge had to accord the jury recommendation. Hays challenges the trial judge's decision to override on a number of theories that are grounded, in his view, in the Eighth and Fourteenth Amendments.

A. Was Override of the Life Sentence Permitted Under Alabama Law?

Hays cites a passage from *Beck v. State,* 396 So.2d 645, 663 (Ala.1980), stating that "If the jury cannot agree on a sentence of death, the defendant shall be sentenced to life imprisonment without parole." He argues that this language from *Beck* precluded the trial judge's override of the jury's life-without-parole recommendation, and he asserts that Alabama's failure to follow its own law violated due process.

Petitioner is due no relief on the grounds that Alabama has misinterpreted its own law. *See Pulley v. Harris,* 465 U.S. 37, 41-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law"). *See also Parker v. Dugger,* 498 U.S. 308, 327, 111 S.Ct. 731, 742, 112 L.Ed.2d 812 (1991) (White, J., dissenting) ("It is axiomatic that ... the views of the State's highest court with respect to state law are binding on the federal courts.") (citing cases) (internal quotation marks omitted). And even if we, as did the Court in *Pulley,* assume for the sake of argument that some errors of state law might be so "egregious" as to offend the due process or equal protection clause, we conclude that the Alabama Supreme Court in *Ex parte Hays* committed no such error in reading the relevant language from *Beck.* A sufficient reason for our conclusion is that *Beck* decided nothing about whether a judge could impose death when the jury had voted for life imprisonment: that question was not presented in *Beck.*[5] And to say the least, no egregious error glares out of *Ex parte Hays*'s ultimate conclusion that the death penalty law under which Hays was sentenced permitted

---

[5]As Chief Justice Marshall wrote in *Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 399, 5 L.Ed. 257 (1821):

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason for this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent.

upward override.[6]    Thus, the state courts' alleged

misinterpretation of Alabama law gives rise to no ground on which

the writ might issue.

B.  Was Hays Afforded the Minimum Notice Required By the
    Constitution That Death Was a Possible Sentence?

Petitioner's claim that there was inadequate notice of the

possibility of an override must likewise fail; and *Lankford v.*

*Idaho,* 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), is not

to the contrary. In  *Lankford,* the Supreme Court held the

petitioner was afforded inadequate notice where the prosecution

stated, in response to a question from the trial judge, that the

state would not seek the death penalty.  The trial judge there had

never announced before the sentencing hearing that death was a

possible sentence.  Here, however, the defendant got two days'

---

[6]After discounting the *Beck* dictum, Alabama's Supreme Court
persuasively explained why upward override is permitted.  First,
the court explained that the quoted language could be squared
with *Beck* 's holding—that ultimate sentencing authority lay with
the judge—only by interpreting the quoted language to mean that
if the jury cannot unanimously agree on death, the *jury* shall
recommend a sentence of life imprisonment.  *Ex parte Hays,* 518
So.2d 768, 775 (Ala.1986).

Second, the court also explained why the 1975 Alabama
death penalty act explicitly allows the judge to override in
favor of life but not in favor of death.  This seeming
omission is because as initially drafted, the capital
sentencing statute simply did not allow a jury to recommend
life imprisonment without parole in the first place.  Once
the *Beck* decision permitted juries to recommend life, judges
impliedly became permitted to override in favor of death.
*See id.* at 775-76.

As the district judge pointed out, there are other
instances when Alabama law can most plausibly be read to
afford the jury ultimate sentencing authority, but where
such is not the case (because the judge can override).  The
instant circumstances present another one of those cases.
Thus, we decline to hold that erroneous application of state
law to the petitioner violated the Fourteenth Amendment.

notice from the trial judge that he might override the jury. And, the prosecution here sought the death penalty from the beginning of trial, in contrast to *Lankford.* Because the prosecution's tack gave Hays an incentive to build a case from the start for life imprisonment rather than death, two days is sufficient notice.

## C. Did the Alabama Sentencing Scheme Sufficiently Channel the Discretion of the Judge and Jury?

Hays argues further that the Alabama sentencing scheme dividing the responsibilities of jury and trial judge at the time he was sentenced was standardless and failed to accord due deference to the jury's sentence recommendation. The Supreme Court rejected this argument in *Harris v. Alabama,* --- U.S. ----, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). In *Harris,* the court held there is no constitutional requirement that a judge assign any minimum degree of weight to a jury recommendation. The issue is simply whether "the scheme adequately channels the sentencer's discretion so as to prevent arbitrary results." *Id.* at ----, 115 S.Ct. at 1035. Considering a sentencing scheme materially identical to the one here, the *Harris* Court held there was adequate channeling of discretion. Here, the trial judge was explicit about his reasons for overriding the jury sentence, and he noted that he considered the jury recommendation; there was therefore no violation of Hays's right to due process.[7]

## D. Did the Trial Court's "Upward Override' Violate the Ban on Ex Post Facto Laws?

---

[7]Hays concedes in his brief that this argument is foreclosed by *Harris* but then goes on to make the argument anyway, apparently in an effort to preserve the issue for higher appellate review.

Petitioner next contends the Alabama Supreme Court's decision in *Ex parte Hays* (holding application of the death penalty to be proper) functions as an ex post facto law. As the district court held, and as we have discussed earlier, however, the Alabama Supreme Court's decision clarified, rather than altered, the meaning of the Alabama death penalty statute pursuant to which Hays was sentenced. In view of this conclusion, no need exists to address Petitioner's argument that the change in the law was substantive, not procedural, under *Dobbert v. Florida,* 432 U.S. 282, 292-94, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977).

E. Did the Motive For the Override Violate the Equal Protection Clause?

Petitioner argues that the Alabama Supreme Court's mention of the number of white defendants on death row in Alabama for the killing of blacks (zero) indicates an intention to "balance the books" by considering the petitioner's race in determining sentence, in violation of his right to equal protection. But, this mention was only part of an extended discussion of elements favoring the imposition of the death penalty. These elements were Hays's moral depravity, the shocking nature of the crime, and the inability to explain the jury's sentence. And, even if the Alabama Supreme Court did look at historical statistics, it might just as well not have been to "balance the books" but to find some motivation to explain the jury's failure to impose the death penalty. That is, the Alabama Supreme Court was attributing a racial motive to the *jury's* decision, rather than setting out a racial motive for its *own* decision to reinstate the sentence imposed by the trial judge. *See, e.g., Ex parte Hays,* 518 So.2d at

776-77 (noting that "[t]he jury's recommendation of life imprisonment in this case is unquestionably a bizarre result," and recalling that in previous cases "the death penalty had likely been imposed in an arbitrary or capricious manner based upon racial discrimination"). By setting out this historical background, the Alabama court was merely suggesting a possible reason for a sentence that it would have reversed regardless of the jury's underlying methodology. Because Hays has failed to meet his burden of showing a decision-maker acted with a discriminatory purpose, his equal protection argument fails. *McCleskey v. Kemp,* 481 U.S. 279, 296-97, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987).

In conclusion, Petitioner's conviction did not violate constitutional rights. The decision of the district court is AFFIRMED. The petition for the writ of habeas corpus is DENIED.