United States Court of Appeals,

Eleventh Circuit.

No. 96-6752.

Steven A. THOMPSON, Petitioner-Appellant,

v.

John Eddy NAGLE, Respondent-Appellee.

July 30, 1997.

Appeal from the United States District Court for the Northern District of Alabama. (No. 94-PT-1674-S), Robert B. Propst, Judge.

Before HATCHETT, Chief Judge, and DUBINA and BLACK, Circuit Judges.

DUBINA, Circuit Judge:

Appellant Steven Allen Thompson ("Thompson" or "defendant") appeals the district court's judgment denying his petition for habeas corpus relief from his convictions and sentence of death. For the reasons that follow, we affirm.

I. STATEMENT OF THE CASE

A. *FACTS*

The Alabama Court of Criminal Appeals repeated the facts as stated by the trial judge in his sentencing order.

> The victim, Robin Balarzs, was engaged to marry David Roberts, a long-time friend of the defendant. On May 11, 1984, David Roberts was absent from Huntsville due to military service. Defendant was aware of this absence. On that day defendant went to the home in Huntsville where Robin Balarz [sic] resided with her parents and her young child. The parents and the child were also out of town. Robin and her friend Cindy McElroy were at the residence. Defendant, Robin and Cindy engaged in normal conversation and defendant slept on a sofa while the girls retired to separate bedrooms. Early on the morning of May 12th defendant left the residence. Cindy McElroy left at a later time. Cindy noticed no unusual behavior on the part of the defendant.

> Defendant was absent without leave from the Navy and had need for money and goods which he could convert to cash. He planned to return to the Balarzs household to feloniously take money, gold or silver. In his planning defendant bought tape, bandages and other items with which to bind Robin. On his arrival in the night of May 12, 1984, defendant entered the household on invitation of his friend and followed a course of conduct which can be described as beyond human comprehension in its vileness. Defendant bound and gagged Robin with a sock, bandage, rope and tape he had brought into her home with premeditated design. He cut her clothes from her person and beat her with his fists. He took a meager $1.00 bill from her purse (although at some point he also took her engagement ring). He

stuffed a sock in her mouth. He cut her with a knife. He positioned his rental vehicle near the garage to facilitate her removal from the residence. He made some effort to conceal the blood and physical tracings of his acts of brutality, placed Robin, still alive, in the vehicle, left the home and drove to secluded Green Mountain, a rugged area in Huntsville, Madison County. There, he proceeded to brutalize Robin Balarzs in a manner almost unspeakable in its nature, character and extent. Defendant had sexual intercourse upon her, shoved a large knife into what he thought to be her vagina, bound her breasts with a rope, tied her to the vehicle and dragged her through mud, over rocks and on pavement for a distance in excess of 3000 feet. At some point he pulled and shaved her hair with a razor especially purchased. He stabbed her about her breasts and cut her with the knife.

Robin Balarzs died during her ordeal. Some of the atrocities were against her corpse.

The defendant realized that left in the Balarzs home were items which would reveal his crimes, if not his identity. He returned to the residence for the purpose of securing these items, leaving Robin Balarzs on Green Mountain.

While defendant was attempting to re-enter the Balarzs home David Roberts returned. Seeing David drive up to the residence, defendant evaded detection and drove away to spend the rest of the night in his vehicle.

David Roberts entered the home and noticed signs of the defendant's depravity. He contacted neighbors and friends of Robin, called hospitals and tried to locate her. Finally, David Roberts called Huntsville Police Department and investigation into the case began. David recalled seeing defendant's vehicle parked near the residence and an alert was dispatched on defendant by radio. At that time it was in connection with a missing person report. In the early morning of May 13, 1984, two uniformed officers saw defendant in his vehicle and stopped him. Defendant's vehicle was dirty and damaged and defendant had what appeared to be blood and mud about his person. Defendant was properly advised of his constitutional rights, taken into custody, removed to police headquarters and questioned. After first denying knowledge of the fate of Robin Balarzs, defendant made statements admitting his activities and led an officer to the scene atop Green Mountain. Robin's battered body was found. Her parents and David Roberts were advised that she was dead.

*Thompson v. State,* 542 So.2d 1286, 1288-89 (Ala.Crim.App.1988).

After his arrest, Thompson made two statements to police. On the day of his arrest, Thompson described the events that occurred at Balarzs' house. Ex.-1, Vol. V at 920-21. He also described dragging Balarzs to his car, putting her in the backseat, placing a sleeping bag over her, and driving her to Green Mountain. Thompson told the police that Balarzs "moaned and groaned" during the drive to Green Mountain. *Id.* at 922. The next morning, Thompson gave police another statement. *Id.* at 949. Thompson described in more detail the events at Balarzs' home. *Id.* at 952-54. Thompson told police that Balarzs was bleeding and vomit was coming out of her mouth when he took her out of the car on Green Mountain. *Id.* at 954. Thompson told police he had sexual intercourse with Balarzs and then described thrusting a butcher knife into her vaginal area, tying her

to his car, and dragging her body.  *Id.* at 955.

B. *PROCEDURAL HISTORY*

On August 9, 1985, a jury convicted Thompson of (1) robbery-murder under ALA.CODE §
13A-5-40(a)(2) (1975), (2) kidnapping-murder under ALA.CODE § 13A-5-40(a)(1) (1975), and (3)
rape-murder under ALA.CODE § 13A-5-40(a)(3) (1975).  By an eight to four vote, the jury
recommended a sentence of life imprisonment without the possibility of parole.  The trial court held
a sentencing hearing.  After reviewing the aggravating and mitigating factors, the trial court
overrode the jury's recommendation and sentenced Thompson to death by electrocution.

The Alabama courts affirmed Thompson's convictions and sentence on direct appeal.  *See
Thompson v. State,* 542 So.2d 1286 (Ala.Crim.App.1988), *aff'd,* 542 So.2d 1300 (Ala.1989).  The
United States Supreme Court denied certiorari and Thompson's petition for rehearing.  *Thompson
v. Alabama,* 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989);  *Thompson v. Alabama,* 493 U.S.
986, 110 S.Ct. 528, 107 L.Ed.2d 527 (1989).

Thompson then filed a petition for post-conviction relief under Temporary Rule 20 of the
Alabama Rules of Criminal Procedure in the Circuit Court of Madison County.[1]  The court held an
evidentiary hearing on Thompson's petition.  The trial court denied the petition and the Alabama
Court of Criminal Appeals affirmed. *Thompson v. State,* 615 So.2d 129 (Ala.Crim.App.1992).  The
Alabama Supreme Court denied certiorari, *Thompson v. State,* No. 1920696 (March 19, 1993), as
did the United States Supreme Court.  *Thompson v. Alabama,* 510 U.S. 976, 114 S.Ct. 467, 126
L.Ed.2d 418 (1993).

Thompson then filed the present habeas corpus petition in the United States District Court
for the Northern District of Alabama.  A magistrate judge entered a 74-page report and
recommendation that the district court deny the petition.  The district court adopted the magistrate's
report and denied Thompson's habeas corpus petition.

The district court denied Thompson's motion for a certificate of appealability but this court
granted it.  We then heard oral argument.

---

[1]Temporary Rule 20 of the Alabama Rules of Criminal Procedure is now Rule 32.

## II. ISSUES

A. Whether the evidence was sufficient to support Thompson's rape conviction.

B. Whether the Alabama Court of Criminal Appeals violated the Ex Post Facto Clause.

C. Whether the State proved beyond a reasonable doubt that Thompson formed the specific intent to kill Balarzs.

D. Whether trial counsel were ineffective.

1. Whether trial counsel's failure to show that no rape occurred constitutes ineffectiveness.

2. Whether trial counsel's failure to show that Thompson did not intend to kill constitutes ineffectiveness.

3. Whether trial counsel's failure to present a mental health defense constitutes ineffectiveness.

4. Whether trial counsel's failure to prevent the introduction of inadmissible evidence constitutes ineffectiveness.

5. Whether trial counsel's failure to call character witnesses constitutes ineffectiveness.

E. Whether a prejudicial variance existed between the evidence and the indictment.

## III. STANDARDS OF REVIEW

We review the district court's findings of fact for clear error, even when the district court's findings are drawn solely from documents, records, or inferences from other facts. *Medina v. Singletary,* 59 F.3d 1095, 1101 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 2505, 135 L.Ed.2d 195 (1996); *Spaziano v. Singletary,* 36 F.3d 1028, 1032 (11th Cir.1994). Whether the evidence was sufficient to allow a reasonable jury to find beyond a reasonable doubt that the defendant committed each element of the crime charged is subject to plenary review. *Huynh v. King,* 95 F.3d 1052, 1059 (11th Cir.1996). We also review *de novo* the Alabama Court of Criminal Appeals' determination that its construction of Alabama's rape laws during Thompson's appeal does not violate the Ex Post Facto Clause. *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983). We review Thompson's ineffective assistance of counsel claims *de novo.* *Weeks v. Jones,* 26 F.3d 1030, 1034 (11th Cir.1994). Finally, whether there was an unconstitutional variance between the indictment and the proof at trial requires two inquiries. *United States v. Prince,* 883 F.2d 953, 959 (11th Cir.1989). First, we determine whether a material variance did indeed occur. *Id.* Second, we determine whether Thompson suffered substantial prejudice as a

result. *Id.*

## IV. DISCUSSION

A. *WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT THOMPSON'S RAPE CONVICTION*

Thompson argues that the evidence was insufficient to prove beyond a reasonable doubt that rape occurred because the evidence showed that Balarzs was dead at the time of intercourse. Under Alabama law, a male commits rape if he "engages in sexual intercourse with a female by forcible compulsion." ALA.CODE § 13A6-61(a) (1975). Forcible compulsion is defined as "[p]hysical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person." ALA.CODE § 13A-6-60(8) (1975). Thompson contends that the State cannot prove "forcible compulsion" if the evidence shows that the victim was dead at the time sexual intercourse occurred. Consequently, Thompson argues that the jury could not reasonably convict him of rape because, according to him, the evidence shows that Balarzs died before sexual intercourse took place. Thompson further claims that any post-mortem acts are irrelevant to the charge of rape. He contends that any acts against Balarzs' body after her death may constitute "abuse of a corpse" under Alabama law, but not rape.[2] In addition, Thompson claims that rape could not be used as an aggravating circumstance for sentencing purposes because the State is required to prove all aggravating circumstances beyond a reasonable doubt. *See* ALA.CODE § 13A-5-45(e). The State argues that it produced evidence at trial from which the jury reasonably could conclude that Balarzs was alive at the time intercourse occurred.

The State's forensic pathologist, Dr. Embry, performed the autopsy on Balarzs' body. Dr. Embry testified at trial that he could not determine whether the act of intercourse took place before or after Balarzs died. Ex.-1, Vol. IV at 749, 752. He did testify that Balarzs aspirated vomit into her lungs and that this caused her death. *Id.* at 744. In Dr. Embry's opinion, strangling or gagging

---

[2]Alabama law provides that "[a] person commits the crime of abuse of a corpse if, except as otherwise authorized by law, he knowingly treats a human corpse in a way that would outrage ordinary family sensibilities." ALA.CODE 13A-11-13(a) (1975).

Balarzs caused her to aspirate. *Id.*

According to Thompson, the State's own testimony proves that Balarzs was dead when intercourse occurred. Thompson points out that Dr. Embry testified that many of the cuts and wounds on Balarzs' body were inflicted after her death. *Id.* at 734. Thompson told police that he had sexual intercourse with Balarzs *after* he cut her and stabbed her. Ex.-1, Vol. V at 955. According to Thompson, this establishes that the act of intercourse took place after Balarzs' death.

The State contends that Thompson's own statements to Police Officer Renfroe ("Renfroe") prove that Balarzs was alive when the act of intercourse occurred. First, Thompson stated that after he tied her up and gagged her with a sock, he asked her if there was any gold or silver in the house. *Id.* at 953. Thompson stated that she shook her head to indicate no and then he cut the binding from her face and removed the sock from her mouth. *Id.* As this occurred at virtually the same time, the State contends that Balarzs was alive when Thompson removed the sock from her mouth. Second, when asked by Renfroe if Balarzs was alive on the way to Green Mountain, Thompson replied that "she was moaning and groaning" during the drive. *Id.* at 922. Third, Thompson told Renfroe that Balarzs was bleeding and vomit was coming from her mouth when he removed her from the car upon arriving at Green Mountain. *Id.* at 954. Thompson stated that he wiped the vomit and blood from Balarzs' face with a towel but that she continued to bleed from her nose until he wiped it several times. *Id.* Finally, Thompson described having intercourse with Balarzs, tying her to his car, and dragging the body. *Id.*

Thompson relies heavily on the testimony of his expert at the Rule 20 hearing to support his claim that the act of intercourse occurred after Balarzs died. The medical evidence produced at the Rule 20 hearing may bear on other claims, such as ineffectiveness of counsel, but is irrelevant to whether the jury, *at trial,* had sufficient evidence to find Thompson guilty of rape.

The sufficiency of the evidence claim advanced by Thompson in this appeal is based on the Due Process Clause of the Fourteenth Amendment, which requires the State to prove beyond a reasonable doubt each element of the offense charged. *Jackson v. Virginia,* 443 U.S. 307, 314, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072-73,

25 L.Ed.2d 368 (1970); *Wilcox v. Ford,* 813 F.2d 1140, 1143 (11th Cir.1987). Under Alabama law, a conviction for rape requires evidence that the victim was alive at the time of intercourse. *Padgett v. State,* 668 So.2d 78, 84 (Ala.Crim.App.1995). In this case, the medical evidence produced at trial was inconclusive as to whether the act of intercourse occurred before or after Balarzs' death. Therefore, this court must presume that conflicting inferences to be drawn from the evidence were resolved by the jury in favor of the State. *See Machin v. Wainwright,* 758 F.2d 1431, 1435 (11th Cir.1985). The relevant question is whether any rational jury, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of rape beyond a reasonable doubt. *See Felker v. Thomas,* 52 F.3d 907, 909 (11th Cir.) (*citing Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789), *opinion supplemented on denial of rehearing by* 62 F.3d 342 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 956, 133 L.Ed.2d 879 (1996). A rational jury could conclude, based on Thompson's own statements, that Balarzs was alive at the time intercourse occurred. Thus, the evidence supports Thompson's conviction for rape, and the district court correctly denied Thompson's claim on this ground.[3]

B. *WHETHER THE ALABAMA COURT OF CRIMINAL APPEALS VIOLATED THE EX POST FACTO CLAUSE*

---

[3]Even if the evidence were insufficient to support Thompson's rape conviction, that would not affect the sentence of death in this case. The jury convicted Thompson of three capital offenses: rape-murder, kidnapping-murder, and robbery-murder. The sentencing judge found two aggravating circumstances. First, the judge found the commission of murder during the course of each of these felonies to be an aggravating circumstance. Ex.-1, Vol. VII at 1322; ALA.CODE § 13A-5-49(4) (1975). Second, the judge found that each of the three capital offenses were especially heinous, atrocious, and cruel compared to other capital offenses. *Id.;* ALA.CODE § 13A-5-49(8) (1975). The judge found Thompson's lack of adult criminal activity to be a mitigating circumstance. *Id.* at 1324; ALA.CODE § 13A-5-51(1) (1975). Thus, even without rape, the kidnapping and robbery convictions amply support the aggravating circumstance of felony-murder and no rational sentencer would have failed to find it. *See Lewis v. Jeffers,* 497 U.S. 764, 781, 110 S.Ct. 3092, 3102-03, 111 L.Ed.2d 606 (1990) ("[I]n determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the more appropriate standard of review is the "rational factfinder' standard established in *Jackson v. Virginia.*"); *see also Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) ("[H]abeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice.' "). Moreover, the aggravating circumstance of "heinous, attrocious, and cruel" remains. Our conclusion is buttressed by the fact that this is an override case. The jury recommended life without parole but the sentencing judge imposed the death penalty.

The Due Process Clause prevents courts from taking actions which, if taken by a legislature, would violate the Ex Post Facto Clause. *See, e.g., Marks v. United States,* 430 U.S. 188, 191-92, 97 S.Ct. 990, 992-93, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia,* 378 U.S. 347, 353-54, 84 S.Ct. 1697, 1702-03, 12 L.Ed.2d 894 (1964); *Rubino v. Lynaugh,* 845 F.2d 1266, 1271 (5th Cir.1988). The Ex Post Facto Clause prohibits criminal prosecution of a defendant for an act which was not a criminal offense at the time the act took place. *Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990); *Rubino,* 845 F.2d at 1273. Thompson argues that the Alabama Court of Criminal Appeals violated the Ex Post Facto Clause when it stated, in an opinion denying post-conviction relief to Thompson, that sexual intercourse after a victim's death could constitute rape under Alabama law.

> This court has held that if an accused had the intent to commit the underlying offense at the time he murdered and the offense is committed immediately after the murder, he is guilty of murder while committing the underlying offense, and the capital murder statute still applies. It seems to be generally understood that it is impossible to say with certainty whether intercourse immediately preceded or immediately followed the murder of a female victim.

*Thompson v. State,* 615 So.2d 129, 133 (Ala.Crim.App.1993) (citations omitted). Because we hold that there was sufficient evidence to support Thompson's rape conviction, we need not reach the Ex Post Facto issue.

Were we to reach the issue, however, Thompson would not prevail. The Alabama Court of Criminal Appeals' decision did not alter the meaning of ALA.CODE § 13A-5-40(a)(3) under which Thompson was convicted. The court merely clarified that when the death and the underlying felony occur contemporaneously, the Alabama capital murder statute can apply even if the death preceded the felony. *See, e.g. Hallford v. State,* 548 So.2d 526, 534 (Ala.Crim.App.1988) ("The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing."); *Clements v. State,* 370 So.2d 708, 713 (Ala.Crim.App.1978) ("[T]he fact that the victim was dead at the time the property was taken would not militate against a finding of robbery if the intervening time between the murder and the taking formed a continuous chain of events."), *aff'd in pertinent part,* 370 So.2d 723 (Ala.1979). When a court clarifies but does not alter the meaning of a criminal statute, the Ex Post Facto Clause is not

implicated. *See Hays v. State of Alabama,* 85 F.3d 1492, 1501-02 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997). Thus, Thompson cannot claim that the Alabama Court of Criminal Appeals' decision operates against him ex post facto.

C. *WHETHER THE STATE PROVED BEYOND A REASONABLE DOUBT THAT THOMPSON FORMED THE SPECIFIC INTENT TO KILL*

Alabama law authorizes capital punishment only if the State proves beyond a reasonable doubt that the defendant had the specific intent to kill the victim. ALA.CODE § 13A-5-40 (1975). Thompson argues that the State did not prove that he formed the specific intent to kill Balarzs. In fact, Thompson argues that the evidence produced at trial showed that he wanted to frighten and control Balarzs, not kill her. Thompson points to the testimony of Renfroe, who recounted Thompson's description of putting the rope around Balarzs' neck. According to Renfroe, Thompson confessed that he "applied enough pressure, to let her know I wasn't messing around." Ex.-1, Vol. IV at 952. In addition, Thompson argues that any post-mortem acts against Balarzs' corpse are irrelevant to whether he formed the specific intent to kill Balarzs.

Thompson procedurally defaulted this claim because he did not raise it at trial, on direct appeal, or at his Rule 20 hearing in state court. In *Marek v. Singletary,* 62 F.3d 1295 (11th Cir.1995), *cert. denied,* --- U.S. ----, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996), we held:

> A state prisoner seeking federal habeas corpus relief, who fails to raise his federal constitutional claims in state court, or who attempts to raise claims in a manner not permitted by state procedural rules, is barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default.

*Id.* at 1301. Thompson cannot show cause and prejudice. He first attempted to raise this claim in his appeal from the denial of post-conviction relief. *Compare* Brief for the Appellant at 36 (appeal from Rule 20 proceeding) *with* Brief and Argument for Appellant (direct appeal). The Alabama Court of Criminal Appeals did not address whether the issue was barred. However, the district court examined Thompson's claim that he raised this issue on both direct appeal and in the Rule 20 proceedings. The district court concluded that Thompson had not raised an intent claim. *See* Mem. Op. dated July, 1, 1996 (N.D.Ala.). Thompson has not addressed the procedural default issue in his brief before this court. In the district court, Thompson alleged ineffective assistance of counsel as

cause. Constitutionally ineffective assistance can constitute cause. *See* Part VI.D (discussing standards governing ineffective assistance of counsel claims). However, the district court concluded that Thompson's counsel was not ineffective in not raising the State's failure to establish Thompson's intent to kill.

Thompson's claim of cause is meritless. First, Thompson's ineffective assistance claim is without factual basis. Renfroe testified that Thompson told him he went to Balarzs' home with the intent to rob her. Ex.-1, Vol. V at 952. Thompson's counsel argued to the jury in closing arguments that Thompson did not have the intent to rob or murder Balarzs. Ex.-1, Vol. VI at 1074-1085. More importantly, the jury easily could infer, from the gruesome evidence in this case, that Thompson intended to kill Balarzs. Because Thompson has not established cause, his intent claim is procedurally barred. *See Marek,* 62 F.3d at 1301.

## D. *WHETHER TRIAL COUNSEL WAS INEFFECTIVE*

The Sixth and Fourteenth Amendments entitle a criminal defendant to the effective assistance of counsel at trial. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Routly v. Singletary,* 33 F.3d 1279 (11th Cir.1994). A defendant claiming ineffective assistance of counsel must show first that counsel's performance was "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Second, a criminal defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. The burden is on the petitioner to establish both of these elements, *Atkins v. Singletary,* 965 F.2d 952, 958 (11th Cir.1992), and the burden is a heavy one. "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *see also Horton v. Zant,* 941 F.2d 1449, 1460 (11th Cir.1991) (Reviewing courts "should presume effectiveness and should avoid second-guessing with the benefit of hindsight.")

Thompson challenges the effectiveness of his trial counsel on five grounds.

*1. Did trial counsel's failure to show that no rape occurred constitute ineffectiveness?*

Thompson argues that "despite the crucial importance at trial of the time of Balarzs' death, [ ] trial counsel did not present forensic evidence to demonstrate *affirmatively* that the act of intercourse occurred after Balarzs died." Brief for Appellant at 39 (emphasis added). Thompson relies heavily on the testimony of his forensic expert at the Rule 20 hearing, Dr. Blake, in arguing that Balarzs was dead when intercourse occurred. Dr. Blake testified that in his opinion Balarzs died within three to four minutes after Thompson gagged her with a sock. Ex.-8, Vol. VI at 70. Dr. Blake also concluded that the act of intercourse occurred after Balarzs' death. *Id.* at 63-64 & 81. Dr. Blake based this conclusion on the absence of semen in Balarzs' home and the absence of trace evidence such as the exchange of skin, bodily fluids, or clothing fibers, which typically indicate that a struggle took place. *Id.* at 84.

Dr. Stilwell, a forensic expert called by the State at the Rule 20 hearing, testified that he could not determine whether the victim was dead or alive when intercourse took place. *Id.* at 150. Dr. Stilwell also testified that he could not determine how long Balarzs lived after Thompson placed the sock in her mouth. *Id.* at 157-60. Dr. Stilwell disagreed with Dr. Blake's conclusion that the absence of trace elements suggested that Balarzs was dead at the time of intercourse. *Id.* at 168. In Dr. Stilwell's view, the absence of trace elements meant nothing in this case because Balarzs' body was dragged behind Thompson's car through mud and over rocks for at least 3,000 feet, which could have destroyed such evidence. *Id.* at 173.

Drs. Blake and Stilwell agreed that the "moaning and groaning" of Balarzs that Thompson recalled was not necessarily evidence that she was alive. Both experts stated that a corpse may emit such sounds if moved shortly after death. *Id.* at 80 (Blake) & 154 (Stilwell). Thus, the medical evidence produced at the Rule 20 hearing, like that at the trial, was inconclusive as to Balarzs' exact time of death.

Because the medical evidence is inconclusive as to whether intercourse took place before or after Balarzs died, it would have been impossible for Thompson's counsel to have shown *affirmatively* that rape did not occur. Failure to do the impossible cannot constitute ineffective assistance of counsel. A reasonable jury could infer, based largely on Thompson's own statements,

that Balarzs was alive when intercourse took place. The district court correctly denied Thompson relief on this claim.

*2. Did trial counsel's failure to show that Thompson did not intend to kill constitute ineffectiveness?*

As discussed in Part IV.C, Thompson's counsel argued to the jury that Thompson did not have the intent to rob or murder Balarzs. Thus, the factual premise of this claim is false. In addition, the jury reasonably could infer from the evidence that Thompson intended to kill Balarzs. This claim is without merit and the district court properly denied it.

*3. Did trial counsel's failure to present a mental health defense constitute ineffectiveness?*

Thompson contends that trial counsel should have presented a mental health expert as part of the defense because Thompson entered a plea of not guilty by reason of mental disease or defect. In addition, Thompson argues that a mental health expert should have been part of the defense because the Lunacy Commission, which examined Thompson before trial, could not reach a unanimous conclusion. Thompson's trial counsel called only one mental health expert, Dr. Hopkins, who had never met with Thompson. Dr. Hopkins explained multiple personality disorder in general terms to the jury. Ex.-1, Vol. VI at 1046. Thompson contends that the decision to rest his entire mental health defense on this witness constituted ineffectiveness.

Thompson's trial counsel hired Dr. Alan Shealy to examine Thompson. Trial counsel testified at the Rule 20 hearing that no psychologist in Alabama had a better reputation in the criminal defense bar than Dr. Shealy. Ex.-8, Vol. VII at 380. After examining Thompson, Dr. Shealy informed trial counsel that his evaluation was not favorable to Thompson. *Id.* Dr. Shealy diagnosed Thompson as antisocial, which, as understood by trial counsel, basically meant Thompson was mean rather than crazy. *Id.* At that point, Thompson's trial counsel elected to pursue a mental health defense through the testimony of Thompson's father and the hypothetical questions presented to Dr. Hopkins based on Thompson's father's testimony. *Id.* at 381-82. Thompson's trial counsel chose this strategy to avoid the presentation of unfavorable evidence. *Id.* at 360-61 & 380-81.

At the Rule 20 hearing, Thompson and the State presented conflicting testimony by mental health experts. Thompson's expert, Dr. Goff, testified that Thompson suffered from a

"depersonalization episode" at the time of the crime. *Id.* at 450-51. Dr. McClaren testified for the State and disputed Dr. Goff's diagnosis. He testified that Thompson suffered from an adjustment disorder resulting from a romantic disappointment. *Id.* at 573. Dr. McClaren stated that such a disorder is "extremely common." *Id.* at 574. The testimony at the Rule 20 hearing therefore was inconclusive regarding Thompson's mental health.

Thompson's counsel was not ineffective in its presentation of a mental health defense. They retained Dr. Shealy, one of the best psychologists known to the Alabama criminal defense bar. Because Dr. Shealy's evaluation of Thompson was not favorable to the defense, counsel made a strategic decision to present a mental health defense based on the testimony of Thompson's father and Dr. Hopkins. This choice was well within "the wide range of professionally competent assistance," *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, particularly considering that defense counsel determined that this strategy would prevent the admission of damaging testimony at trial. The district court therefore properly denied Thompson relief on this claim.

*4. Did trial counsel's failure to prevent the introduction of inadmissible evidence constitute ineffectiveness?*

Thompson claims that at the trial the State cross-examined his father and elicited inadmissible testimony regarding Thompson's juvenile proceedings. Thompson claims that counsel's failure to prevent the admission of this testimony constituted ineffectiveness. The State asked Thompson's father if anyone made him aware that Thompson had committed a violent act against a female student. Ex.-1, Vol. VI at 1026. Thompson's father answered in the affirmative and stated that his son was fifteen at the time. *Id.* The State then asked if this was why he put his son in Retreat Hospital. He replied that he put Thompson in the hospital because Thompson needed help. *Id.* at 1027.

This claim is without factual basis. Although Thompson is correct that testimony regarding a juvenile adjudication is inadmissible in a criminal proceeding in Alabama, *see Oliver v. State,* 440 So.2d 1180, 1181 (Ala.Crim.App.1983), the testimony Thompson complains about did not refer to a juvenile adjudication. As the magistrate judge found, "this testimony said nothing about a 'juvenile adjudication.' " Rec. Vol. I, Tab # 14 at 63. Furthermore, Thompson's counsel objected

to the admission of this testimony, and argued to the court, outside the presence of the jury, that the State was attempting to get into Thompson's juvenile record. Ex.-1, Vol. VI at 1025-26. The district court correctly denied Thompson relief on this claim.

*5. Did trial counsel's failure to call character witnesses constitute ineffectiveness?*

Thompson contends that counsel failed to call available character witnesses at trial and that this failure probably caused his conviction. Defense counsel believed that character witnesses could take the stand only if the defendant testified. Ex.-8, Vol. VII at 358 (McDaniel) & 423 (Sandlin). However, Alabama law allows good character testimony as part of the defense even if the defendant does not testify. *Thomas v. State,* 41 Ala.App. 19, 122 So.2d 731, 734 (1960). Defense counsel therefore misunderstood the law, which is "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Thus, the court must consider whether "a reasonable probability [exists] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. The burden is on Thompson to establish that prejudice resulted from counsel's error. *Atkins v. Singletary,* 965 F.2d 952, 958 (11th Cir.1992).

At the Rule 20 hearing, Thompson called five unrelated character witnesses whom he claimed would have testified for him at trial. The testimony of these witnesses is discussed in detail in the Magistrate Judge's Report. *See* Rec. Vol. I, Tab # 14 at 65-68. We have reviewed the record and conclude that this testimony could not have affected the outcome of the trial because the testimony was unbelievable and these witnesses were biased. As stated by the Rule 20 trial court:

> The individuals who were called as purported character witnesses at the Rule 20 proceedings are either not credible witnesses because of their evident bias or lack of knowledge, or they had such weak testimony to offer that the presentation of their testimony would have detracted from the strength of other testimony offered by the defendant at trial.

*Thompson v. State,* 615 So.2d 129, 134 (Ala.Crim.App.1992). Given the overwhelming evidence in this case, Thompson cannot prove that the testimony of these character witnesses would have resulted in an acquittal.

It is not clear from the briefs whether Thompson also claims counsel's failure to call these character witnesses at the sentencing hearing constituted ineffectiveness. Counsel called only

Thompson's father and two sisters at the sentencing hearing. Counsel believed their pleas for Thompson's life were persuasive and that the testimony of the other character witnesses would not be helpful. Ex.-8, Vol. VII at 358-59 & 392. Obviously, counsel was correct. The jury, by an eight to four vote, recommended life imprisonment rather than the death penalty. Given the heinous nature of the crimes, counsel was anything but ineffective at the sentencing hearing.

E. *WHETHER A PREJUDICIAL VARIANCE EXISTED BETWEEN THE EVIDENCE AND THE INDICTMENT*

Thompson claims the indictment varied materially from the proof offered at trial. The indictment stated that Thompson caused Balarzs' death by "striking her with his fists and dragging her behind an automobile, either or both of which acts resulted in the aspiration of stomach contents and suffocation." Ex.-1, Vol. VI at 1193. Thompson argues that the State did not prove this, and instead proved that Balarzs died after Thompson gagged her with sock.

An accused has a constitutional right to an indictment which puts him on notice of the case the prosecution will present at trial. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Peel,* 837 F.2d 975, 976-77 (11th Cir.1988); *Ex Parte Washington,* 448 So.2d 404, 408 (Ala.1984). The rationale behind the rule prohibiting material variances between indictments and proof at trial is twofold. Most importantly, the rule insures "that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial." *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). Secondly, the rule protects the accused against subsequent prosecutions for the same offense. *Id.* The Eleventh Circuit has established a two-step inquiry when considering allegations of variance between indictments and proof at trial. "First, we must determine whether a material variance did indeed occur; and second, whether [the defendant] suffered substantial prejudice as a result of the variance." *United States v. Starrett,* 55 F.3d 1525, 1553 (11th Cir.1995) (citations omitted), *cert. denied, Sears v. United States,* --- U.S. ----, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996).

Neither requirement is met in this case. Regarding the first requirement, it is undisputed that the cause of Balarzs' death was aspiration of stomach contents and suffocation. Ex.-1, Vol. IV at

744. As discussed in Parts IV.A and IV.D-1, however, it is impossible to determine the exact time of death or which particular acts by Thompson caused Balarzs to aspirate her stomach contents. Although the State's pathologist, Dr. Embry, testified that Balarzs died as a result of being strangled with a rope or being gagged, Dr. Embry also testified that lack of oxygen, which results from trauma or shock, causes nausea and vomiting. *Id.* at 751-52. The jury reasonably could have inferred that the struggle at Balarzs' home, which involved "striking her with his fists" caused Balarzs trauma and shock, triggering the aspiration of her stomach contents. The fact is Balarzs suffered injuries from beating, strangling, gagging, cutting, stabbing, shaving, and dragging at the hands of Thompson. As the Court of Criminal Appeals concluded, "it is clear that these acts were part of the same atrocious transaction." 542 So.2d at 1290. The State's inability to pinpoint which particular part of the "atrocious transaction" caused Balarzs' death does not mean that there was a material variance between the indictment and the proof at trial.

Even assuming a material variance existed, Thompson cannot satisfy the second requirement of his claim—that the variance caused him "substantial prejudice." Thompson admitted committing these crimes. In fact, his counsel admitted the beating, strangling, stabbing, cutting, and dragging during opening statements to the jury. Ex.-1, Vol. III at 410. Thus, Thompson clearly had notice of the charges against him, was able to prepare a defense, and was not surprised by the evidence introduced at trial. *See Berger,* 295 U.S. at 82, 55 S.Ct. at 630-31. The district court therefore properly denied Thompson relief on this claim.

## V. CONCLUSION

We see no constitutional deficiency in Thompson's convictions or sentence. Accordingly, we affirm the district court's judgment denying Thompson's petition for habeas corpus.

AFFIRMED.